# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SHARON ANN VINCENT, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| v. | )   Case No. CIV-15-610-CG |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
|     **Defendant.** | ) |

## OPINION AND ORDER

Plaintiff Sharon Ann Vincent brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1381-1383f. The parties have consented to the jurisdiction of a United States Magistrate Judge. Upon review of the administrative record[1] and the arguments and authorities submitted by the parties, the Court concludes that the Commissioner's final decision is not supported by substantial evidence. The decision is reversed and the case remanded for further administrative proceedings.

PROCEDURAL HISTORY AND ADMINISTRATIVE DECISION

Plaintiff protectively filed her DIB and SSI applications on November 8, 2011,

---

[1] Citations to the administrative record (Doc. No. 13) are as "R. __," using the pagination assigned by the SSA in the certified copy of the transcript of the administrative record. Citations to other documents filed in this Court use the pagination assigned by CM/ECF.

alleging disability since October 21, 2011, due to limitations in connection with a broken left hip. *See* R. 9, 105-14, 136-37, 141. Following denial of Plaintiff's applications initially and on reconsideration, a hearing was held before an Administrative Law Judge ("ALJ") on August 29, 2013, at which Plaintiff, Plaintiff's sister Silbia Evans, and a vocational expert ("VE") all testified. R. 21-44, 45-58, 63-67. The ALJ issued an unfavorable decision on November 27, 2013. R. 9-16.

As relevant in this matter, a person is "disabled" within the meaning of the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that "has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a). The Commissioner uses a five-step sequential evaluation process to determine entitlement to disability benefits. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009); 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 21, 2011, her alleged disability-onset date. R. 11. At step two, the ALJ found that Plaintiff had one "severe" impairment, a broken left hip. R. 11-13. At step three, the ALJ determined that Plaintiff's severe impairment did not meet or equal any of the presumptively disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 11-13.

The ALJ next found that Plaintiff retained the residual functional capacity ("RFC") to perform "light work" as that term is defined in 20 C.F.R. §§ 404.1567 and 416.967, subject to the further limitations that Plaintiff can "occasionally climb[] ramps but never

stairs or ladders" and "can occasionally stand/sit."[2]  R. 14.  At step four, the ALJ, relying on the VE's testimony, found that Plaintiff's RFC allowed her to return to her "past relevant work as a fast food assistant manager" as that job is "actually and generally performed."  R. 15.  Therefore, the ALJ concluded that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from October 21, 2011, through November 27, 2013.  R. 15.  The Appeals Council declined to review that decision, R. 1-4, and this appeal followed.

STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited to determining whether factual findings are supported by substantial evidence in the record as a whole and whether correct legal standards were applied.  *Poppa v. Astrue*, 569 F.3d 1167, 1169 (10th Cir. 2009).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (internal quotation marks omitted).  "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004) (internal quotation marks omitted).  The court "meticulously examine[s] the record as a whole," including any evidence "that may undercut or detract from the

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b), 416.967(b).  "Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

3

ALJ's findings," "to determine if the substantiality test has been met." *Wall*, 561 F.3d at 1052 (internal quotation marks omitted). While a reviewing court considers whether the Commissioner followed applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment for that of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).

## ANALYSIS

Plaintiff asserts that the ALJ's RFC determination is "legally flawed and not supported by substantial evidence." Pl.'s Br. (Doc. No. 15) at 12. Plaintiff specifically challenges the ALJ's assessment of the credibility of Plaintiff's and Ms. Evans' descriptions of Plaintiff's pain and other symptoms. Pl.'s Br. at 7-12.

*A. The Relevant Evidence*

Plaintiff worked for many years as a manager at a local fast-food restaurant. R. 155-57. Her last job kept her on her feet and "always on the go" eight hours a day, five days a week, waiting on customers, restocking food and supplies, and busing tables. R. 156. In October 2011, Plaintiff slipped at work and fell on her left hip. She experienced pain and an occasional "popping" sensation but continued to work until the pain worsened. R. 196.

1. Medical Records

On October 13, 2011, Plaintiff went to the emergency room complaining of left-thigh pain. R. 196. Plaintiff had full range of motion in her acetabular joint but expressed tenderness to palpation of the left thigh. R. 197. She was diagnosed with muscle strain and discharged with instructions to take anti-inflammatory, pain, and muscle-relaxant medications, ice her hip, and take a few days off work. R. 197.

Plaintiff returned to the emergency room on October 27, 2011, complaining of "significant" left-hip pain and an inability to bear weight on that leg after falling again. R. 215-16, 218. X-rays showed "marked varus deformity" and a fracture through the left femoral neck at the trochanter level. R. 199. The same day, Derek West, DO, preformed an open reduction and internal fixation of the left hip using a distal set screw and gamma nail. R. 209, 211, 213. Plaintiff was hospitalized for several days and required "maximum" or "total" assistance dressing, transferring, and toileting during that time. R. 218. She could "ambulate 4 to 6 steps with a rolling walker" as well as two people providing "moderate assistance." R. 218.

On October 31, 2011, Plaintiff was discharged to Jim Thorpe Rehabilitation Center ("JTRC") for comprehensive inpatient physical and occupational therapy. R. 209, 220, 222. The discharging physician noted that Plaintiff also had osteoarthritis which should be monitored and treated with pain medications as needed. R. 220. Plaintiff remained at JTRC until November 8, 2011. R. 223. Upon discharge, Plaintiff could "ambulate 150 feet x2 modified independent with a rolling walker" and go "up and down four steps with standby assistance and verbal cues for safety and sequencing." R. 223. She was rated "modified independent" in her ability to dress, bathe, and use the toilet and "independent" in her ability to feed and groom herself. R. 223. Plaintiff was discharged "home with assistance of family as needed," a home exercise plan, and adaptive devices including a walker, raised toilet seat, and dressing equipment. R. 223.

On November 10, 2011, Plaintiff was seen by Dr. West at Southwest Orthopedic and Reconstructive Specialists for her first follow-up appointment. R. 242. Dr. West instructed

Plaintiff to continue using her walker and opined that Plaintiff would be "temporarily totally disabled" until her next visit. R. 242. Plaintiff returned to Dr. West's office on November 17, 2011. R. 255. Dr. West opined that Plaintiff "would benefit from weightbearing as tolerated" and instructed her to "start some physical therapy 3 times a week for 4 weeks." R. 255. He also noted that Plaintiff "would probably require a hip replacement" at some point. R. 255. On November 29, 2011, Plaintiff returned to Dr. West's office earlier than scheduled because she was experiencing "severe aching" and could not lie on her left side. R. 254. Dr. West expressed concern that Plaintiff's orthopedic hardware "might develop a nonunion" and again opined that Plaintiff was likely a candidate for a total hip replacement. R. 254. On December 15, 2011, Plaintiff told Dr. West that she was "doing well" overall. R. 253. Plaintiff returned to Dr. West's office on December 22, 2011, to reevaluate her hip. R. 252. Plaintiff told Dr. West that she had been well until that day. X-rays showed that the screw head in her hip had cut through. R. 252. Dr. West opined that Plaintiff "would benefit from a total hip arthroplasty." R. 252. Plaintiff was admitted to the hospital later that day. R. 335.

On December 23, 2011, Bradley Reddick, DO, removed Plaintiff's failed hardware and replaced her left hip joint with a titanium cup and stem. R. 272-74. Plaintiff remained in the hospital until January 5, 2012. R. 329. Upon discharge, Plaintiff was "up and ambulating with physical therapy down the hall with 50% weightbearing" and was stable enough to go home. R. 330. The discharging physician instructed Plaintiff to take Lortab (hydrocodone) for pain as needed and to continue weightbearing activity "50% as tolerated with [a] walker." R. 330.

6

Plaintiff saw Dr. Reddick at Southwest Orthopedic and Reconstructive Specialists for a follow-up appointment on January 11, 2012. R. 275. She told Dr. Reddick that she was "doing okay" with her home exercises but had not yet arranged for home-based physical therapy. R. 275. On exam, Plaintiff tolerated 20 degrees internal and external rotation and expressed no tenderness to palpation. R. 275. X-rays showed that the new hardware was "well fixed and in good position." R. 275. Dr. Reddick refilled Plaintiff's Norco (hydrocodone) pain medication and instructed Plaintiff to keep using her walker and to continue taking unspecified "hip precautions." R. 275. At her next visit on January 18, 2012, Plaintiff tolerated range of motion in her left hip and "walk[ed] fairly well with a walker." R. 276. Dr. Reddick instructed Plaintiff to keep using her walker and to return in one month. R. 276. Plaintiff returned to Dr. Reddick's office one week later reporting that her hip was stiff and painful in the mornings but that she was "doing much better" and improving overall. R. 277. X-rays showed that the hardware was still "well fixed and in good position." R. 277. Dr. Reddick instructed Plaintiff to keep using her walker and wean herself off the assistive device "at her convenience." R. 277.

Plaintiff saw Dr. Reddick for her three-month postoperative visit on March 28, 2012. R. 278. She reported she was "doing well" but still "walk[ed] with a limp" and occasionally used "a walker if she is going any distance at all." R. 278. Plaintiff "denie[d] any problems" with the hip and reported being "happy" with the way it felt. R. 278. X-rays of the orthopedic hardware were again unremarkable. R. 278. Dr. Reddick told Plaintiff to "continue her walking" and they "discussed . . . discontinuing her hip

precautions." R. 278. Plaintiff was instructed to return in six months for a routine follow-up appointment. R. 278.

On July 2, 2012, Plaintiff went to the emergency room complaining of "moderate" "achy pain" and swelling in her right leg. R. 290, 296. The attending physician diagnosed sepsis secondary to cellulitis and admitted Plaintiff to the hospital for observation. R. 282-83, 292. Diagnostic images of Plaintiff's right leg showed "very severe degenerative changes" at the knee joint and apparent "chronic deformity of the distal shaft of the fibula, probably a remote healed fracture," but no "abnormal soft tissue gas" or evidence of deep-vein thrombosis. R. 286, 288, 291. Plaintiff was discharged from the hospital on July 7, 2012. R. 294. The discharging physician noted that Plaintiff was morbidly obese and needed to find a primary-care physician. R. 294.

On October 21, 2012, Plaintiff went to the emergency room complaining of "10 out of 10" "burning and sharp" pain in her left leg. R. 306. She denied muscle and join pain, R. 306, but reported taking over-the-counter ibuprofen and Tylenol as needed for "chronic pain status post left hip replacement after injury," R. 314, 316. The attending physician diagnosed cellulitis of the left leg and admitted Plaintiff to the hospital for intravenous antibiotics and observation. R. 307. The next day, a consulting physician recommended that Plaintiff keep her leg elevated, although he did not say for how long. R. 311. Plaintiff was discharged from the hospital on October 26, 2012. R. 312. This is the most recent treatment note in the administrative record.

2. Opinion Evidence

In January 2012, state-agency physician Judy Marks-Snelling, DO, MPH, reviewed Plaintiff's medical records available through December 22, 2011. *See* R. 45-46, 51-52, 261-68. Dr. Marks-Snelling opined that Plaintiff was not disabled because she did not meet the Act's "durational" requirement—i.e., Dr. Marks-Snelling expected that Plaintiff could return to her past work as a fast-food restaurant manager within twelve months of her October 27, 2011 surgery. *See* R. 47, 51-52, 55-66, 268. Although Dr. Marks-Snelling noted that x-rays taken on December 22, 2011, showed Plaintiff "had some hardware failure," Dr. Marks-Snelling apparently did not have before her records for the full left hip replacement that was done on December 23, 2011. *See* R. 268 (making no reference to hip replacement surgery or any event after "12/22/11").

In July 2012, state-agency physician Timothy Walker, MD, noted that the agency "will need to follow up to find out if there have been new x-rays for treatment on [left] hip" or whether there was any new medical evidence from Plaintiff's doctors "with reference to the hardware failure" that Dr. Marks-Snelling had noted. R. 269. Dr. Walker also opined that the agency "may need" to order a consultative exam before reconsidering Plaintiff's disability claim. R. 269. One month later, state-agency physician Penny Abner, MD, noted that there was no new evidence in Plaintiff's file and, as such, she lacked sufficient information to rate Plaintiff's current condition. R. 270; *see also* R. 50, 63-64, 66-67. On January 29, 2013, Plaintiff submitted additional medical records detailing her hip replacement surgery on December 23, 2011, and treatment through October 2012. R. 271-79 (Ex. 6F), 280-317 (Ex. 7F), 318-54 (Ex. 8F). No

9

consultative examination or review was ordered upon receipt of those records or at any time prior to the August 29, 2013 administrative hearing.

3. Testimony of Plaintiff and Ms. Evans

Plaintiff filed for DIB and SSI on November 8, 2011, the same date she was discharged from JTRC after her first surgery. R. 9, 243. On November 27, 2011, Plaintiff completed an Adult Function Report describing her impairment and pain, and the significant limitations both caused in her daily activities and overall ability to function. R. 147-54 (Ex. 3E). Plaintiff reported that she walked with a walker and that she needed help bathing, getting dressed, caring for her pets, and preparing simple meals. R. 148-49, 152. She left the house only to go to doctors' appointments and did not drive, go out alone, or perform any household chores. R. 150-51. Plaintiff estimated that she could walk twenty feet (always with a walker) before needing to stop and rest for fifteen minutes. Plaintiff also reported that a doctor had prescribed crutches, a walker, and a wheelchair after her hip surgery and inpatient rehab. R. 153.

In August 2012, Plaintiff submitted updated information about her impairment, functional limitations, and activities of daily living. R. 166-73, 177-79. Plaintiff reported that, eight months after her hip replacement, she still used a cane or a walker "all the time" when walking and that she could not stand for very long before needing to sit down. R. 166, 171-72. Plaintiff also reported that she still could not go out alone and needed help "shopping [for] groceries and such." R. 172, 179.

Plaintiff and her sister Ms. Evans, R. 166, both testified at the administrative hearing on August 29, 2013. R. 25-35, 35-40. When the ALJ asked Plaintiff "what would keep

[her] from doing some sort of light work, and something that . . . didn't involve heavy lifting or that kind of thing," Plaintiff responded that she "use[s] a cane all the time" and she has "trouble" sitting and standing for "long periods of time." R. 30; *see also* R. 31. Plaintiff estimated that she could stand for ten or fifteen minutes and could not walk even one-half block before needing to sit down and rest for ten minutes. R. 31, 34. She testified that she could sit for fifteen or thirty minutes at one time because sitting "agitates" the metal rod in her left hip and leg. R. 31, 32, 34. Elevating her feet above her chest provided "some" relief throughout the day. R. 33. Plaintiff testified that she lived with her brother and sister-in-law and could only help with "little things" around the house like feeding the pets and clearing the dining table. R. 31-32.

Ms. Evans testified that she knew Plaintiff was "in constant pain" because she saw Plaintiff every day. R. 36, 39. She testified that Plaintiff had left the house twice all summer and that it took Plaintiff twenty-five minutes to walk up the ramp at the Social Security office the morning of this hearing. R. 37. Ms. Evans also told the ALJ about one time when she took Plaintiff for a swim in the pool at their brother's apartment complex but Plaintiff had so much difficulty climbing the pool steps that they "had to go get her wheelchair to bring her back to the apartment." R. 38-39. Ms. Evans said that Plaintiff did not use the wheelchair except on that occasion and "[a] couple of times" when her family used it to transport her to the emergency room. R. 39.

*B. The ALJ's Findings*

After summarizing the medical evidence—including the records of Plaintiff's December 23, 2011 hip-replacement surgery and subsequent treatment—the ALJ made the following findings at step three of the sequential evaluation process:

> The claimant has reported chronic musculoskeletal pain. Some doctors have noted arthritis. X-rays and magnetic resonance imaging studies have been negative. The claimant has not had referrals for extensive pain treatment[;] nor has she had referrals for orthopedic or neurosurgical specialists. She does not have consistent findings of loss of gait and station . . . . There is no evidence of joint dysfunction or malformation. She likely has aggravation of weight-bearing joints by her size.

R. 13 (concluding that Plaintiff's impairment did not meet or equal "the listed musculoskeletal impairments generally"). In stating his assessment of Plaintiff's RFC, the ALJ did not provide any additional discussion of the medical evidence, other than to find that (1) "great weight" is given to Dr. Marks-Snelling's opinions that "the claimant could perform light work activity with no posture, manipulative, visual, communicative or environmental limitations," and (2) Plaintiff's description of her pain and other symptoms "is not entirely credible." R. 14, 15.

Ultimately, the ALJ assigned limitations exceeding those found by Dr. Marks-Snelling, stating that Plaintiff has the RFC to perform "light work" as that term is defined in the regulations except that Plaintiff is limited to "occasional[] climbing of ramps but never stairs or ladders" and she "can occasionally stand/sit." R. 14. The ALJ explained that this RFC was "supported by the evidence of record when considered as a whole, including the objective evidence." *See* R. 15. During the administrative hearing, the VE specified— without correction by the ALJ—that she interpreted this sit-stand option as meaning that

12

Plaintiff must be able to sit or stand at her discretion "[u]p to one-third" of an eight-hour day "incrementally through the day." R. 42.

*C. Discussion*

1. <u>The RFC Determination Is Inadequately Explained and Not Supported by Substantial Evidence</u>

A claimant's RFC represents the most work-related activity he or she can do in an ordinary workplace setting on a regular and continuing basis despite the combined limiting effects of his or her medically determinable impairments. *See* 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p, 1996 WL 374184, at *2, *5 (July 2, 1996). "The RFC assessment must be based on *all* of the relevant evidence in the case record" and "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence," including the claimant's subjective complaints of pain or other symptoms. SSR 96-8p, 1996 WL 374184, at *5, *7; *see also Poppa*, 569 F.3d at 1171 ("Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined.").

As an initial matter, the medical opinion of Dr. Marks-Snelling provides little support for the ALJ's RFC determination. Dr. Marks-Snelling based her opinion on the medical records for Plaintiff available through December 22, 2011, *see* R. 261-68, and thus did not consider the hip-replacement surgery performed on December 23, 2011, or

13

Plaintiff's subsequent relevant treatment.³ Defendant argues that a medical opinion made "at an earlier step in the administrative process" is still evidence to be considered by the ALJ, *see* Def.'s Br. (Doc. No. 21) at 7, but that misses the salient point. In her January 2012 report, Dr. Marks-Snelling opines as to what Plaintiff's condition will be *on October 27, 2012*, twelve months after Plaintiff's first surgery. R. 261. Whatever evidentiary value Dr. Marks-Snelling's projection might have had if the facts on which it was based held true, the intervening event of Plaintiff's second, more-invasive surgery substantially changed the relevant facts and rendered the projection largely meaningless. The resulting question for the Court is whether the ALJ's RFC determination is supported by substantial evidence in the record absent consideration of that opinion.

No other medical opinion is cited by the parties as meaningful: Plaintiff did not present any opinion from a treating physician or other acceptable medical source calling for limitations greater than those set forth in the RFC, and the sole medical opinion cited in support of the RFC is that of Dr. Marks-Snelling. An ALJ is "competent, in the absence of a medical opinion, to assess" a claimant's RFC based on all the other relevant evidence in the record. *McDonald v. Astrue*, 492 F. App'x 875, 885-86 (10th Cir. 2012) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012)). Here, however, the ALJ's discussion of

---

³ The ALJ gave Dr. Marks-Snelling's opinion "great weight" but did not specify in what way he found the opinion relevant. R. 15. There is some indication that the ALJ believed, incorrectly, that Dr. Marks-Snelling based her RFC assessment on medical evidence produced after Plaintiff's December 23, 2011 hip replacement surgery. *See* R. 29 (ALJ stating during administrative hearing: "Well, in January of 2012, the consulting medical doctor for Social Security performed an evaluation of your circumstance . . . and found that your most recent, and hopefully, final set of hardware was in satisfactory position . . . .").

14

Plaintiff's medical records is flawed and does not allow a finding that substantial evidence supports the RFC determination.

The objective medical evidence largely supports what one must infer is the ALJ's overarching assessment: that Plaintiff was recovering as might typically be expected from her two surgeries, including the December 23, 2011 hip replacement. However, Plaintiff's post-surgery treatment records suggest possible exceptions that are not properly addressed by the ALJ. In July 2012 and October 2012, Plaintiff was hospitalized for cellulitis. R. 282-83, 292, 307. During the course of the first such hospitalization, testing demonstrated "very severe degenerative changes" "at the right knee joint" and "chronic deformity of the distal shaft of the [right] fibula." R. 286. Despite noting these results in his summary of the medical evidence, the ALJ at step three found that there "is no evidence of joint dysfunction or malformation." R. 13. Aside from this incorrect statement, neither the ALJ nor any medical source evaluated the impact of severe infection or of joint deterioration and bone deformation on Plaintiff's ability to function to the level required by the RFC.

In his step-three finding, the ALJ also cited a lack of "consistent findings of loss of gait and station." R. 13. To the contrary, the medical records reflect that Plaintiff's ability to walk and stand were greatly affected by her hip replacement surgery and then improved—with the important questions being how much and when—as she recovered. *See*, *e.g.*, R. 223, 242, 275, 276, 277, 278, 330. The difference is significant because the ALJ does not otherwise cite any evidence or give any explanation for determining that Plaintiff at some particular point in time could perform "light work" with a sit-stand option. Although an ALJ need not discuss every item of evidence, it must be clear that all of the

15

relevant evidence was considered. *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996); *accord Blea v. Barnhart*, 466 F.3d 903, 915 (10th Cir. 2006) (an ALJ must discuss "the evidence supporting his decision," the "uncontroverted evidence he chooses not to rely upon," and any "significantly probative evidence he rejects" (internal quotation marks omitted)).[4]

Given the limited discussion in the ALJ's decision, and in particular the absence of any express consideration of the possibilities of impact from joint deterioration and bone deformation or an incomplete/extended recovery from hip replacement surgery, the Court cannot conclude that substantial evidence supports the ALJ's RFC determination. The decision is remanded for further consideration of Plaintiff's RFC, including her abilities to walk, stand, and sit during the course of an eight-hour workday.

2. <u>The ALJ's Assessment of the Credibility of the Lay Witness Testimony Is Not Supported by Substantial Evidence and, Therefore, Also Undermines the RFC Determination</u>

Regarding the ALJ's credibility analysis, the ALJ provided two specific reasons for not fully accepting Plaintiff's and Ms. Evans' descriptions of the pain and other symptoms that Plaintiff experienced:

> The claimant alleged difficulty ambulating and severe pain; however, medical records noted the claimant reported she was doing well. Testimony noted the

---

[4] The ALJ also stated that Plaintiff's x-rays and MRI studies were "negative" and there were no "referrals for orthopedic . . . specialists." R. 13. On their face those statements are incorrect in light of Plaintiff's orthopedic surgeries and the x-rays leading up to those surgeries. The Court assumes that the ALJ meant to say that the x-rays showed no significant injury beyond what would be expected for someone who required and then was recovering from hip replacement surgery, but it would have been clearer if the ALJ stated as such.

claimant tried not to use the wheelchair but no medical records noted a wheelchair being prescribed by a physician.

R. 14-15. Neither of these statements is adequately supported by the record, however.

The ALJ's first stated reason for not fully crediting Plaintiff's testimony is that in the course of her recovery from surgery she stated to medical personnel that "she was doing well." R. 14. A "claimant's credibility may be adversely impacted where the claimant's statements to a medical source are inconsistent with other statements made in connection with the claim." *Miranda v. Barnhart*, 205 F. App'x 638, 642 (10th Cir. 2005) (citing SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996)). But the ALJ must evaluate such comments in the context in which they were made. *See id.* at 642-43.

> When an ALJ relies on a claimant's statement about her condition on a single occasion as a basis for assessing her condition over a greater time period and then uses that assessment to discount the credibility of the claimant's testimony, we must carefully examine the record as a whole to ensure that substantial evidence supports the ALJ's reliance on the claimant's statement in this fashion.

*Jones v. Colvin*, 514 F. App'x 813, 820 (10th Cir. 2013).

Here, the ALJ makes too much of what Plaintiff is reported to have said. In March 2012, shortly after the surgeon who performed Plaintiff's hip replacement had instructed Plaintiff to wean herself off use of a walker "at her convenience," Plaintiff stated that she was "doing well" and was "happy" with the way her hip felt. *See* R. 277, 278. The treatment notes for this same time period state, however, that Plaintiff "walk[ed] with a limp" and used a "walker if she [was] going any distance at all." R. 278. Without further explanation, the Court cannot agree that Plaintiff's isolated comments are so "inconsistent" with her later descriptions of chronic pain that the inconsistency "constitute[s] substantial

evidence to support the ALJ's credibility evaluation." *Miranda*, 205 F. App'x at 643; *see also Jones*, 514 F. App'x at 821.

The ALJ's second stated reason for not fully crediting Plaintiff's testimony is that Ms. Evans had testified that Plaintiff "tried to not use the wheelchair but no medical records noted a wheelchair being prescribed by a physician." R. 14. *But see* R. 153 (Plaintiff reporting that she had been prescribed a wheelchair by a doctor). The fact that Plaintiff was not required to use (and no record reflected that a physician had prescribed the use of) a wheelchair in order to accommodate pain-related functional limitations could be relevant evidence in support of the ALJ's finding that Plaintiff's pain is not as debilitating as she and Ms. Evans testified. *See* 20 C.F.R. § 404.1529(c)(3) (stating that information a physician provides about a claimant's symptoms is a factor to be considered in determining the intensity, persistence, and limiting effects of symptoms that can be difficult to measure objectively, like joint and muscle pain); *id.* § 416.929(c)(3) (same). But the ALJ does not address the uncontroverted evidence that Plaintiff's surgeons prescribed use of a walker, Plaintiff still occasionally used a walker as late as August 2012, and otherwise Plaintiff used a cane to help her walk "all of the time" after her second hip surgery. R. 30, 153, 166, 171-72, 223, 242, 275, 276, 277, 278, 330. Again, at issue here is whether Plaintiff can perform "light work" with an additional sit-stand option. Without further explanation, the Court cannot agree that Plaintiff's lack of need or prescription for a wheelchair—but apparently accepted need and prescription for other assistive devices—constitutes substantial evidence in support of the ALJ's credibility assessment. *Cf. Staples v. Astrue*, 329 F. App'x 189, 191-92 & n.1 (10th Cir. 2009) (noting that "[t]he standard described in SSR 96-9p does not

require that the claimant have a prescription for the assistive device in order for that device to be medically relevant to the calculation of her RFC. Instead, she only needs to present medical documentation establishing the need for the device. The ALJ therefore erred in relying on Ms. Staples' lack of a prescription for a cane" when concluding that she could perform "light" work (citing SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996))).

Contrary to the Commissioner's implicit invitation to do otherwise, *see* Def.'s Br. at 9-14, this Court must review the ALJ's credibility determination "based solely on the reasons stated in the [ALJ's] decision," lest it overstep its "'institutional role and usurp essential functions committed in the first instance to the administrative process.'" *Robinson v. Barnhart*, 366 F.3d 1078, 1084-85 (10th Cir. 2004) (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004)). In other words, as it stands the ALJ's credibility assessment is not supported by substantial evidence, and to the extent the ALJ based his credibility determination on reasons other than those set forth in the decision the credibility analysis is legally flawed. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2, *superseded by* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016); *Blea*, 466 F.3d at 915 (an ALJ must discuss "the evidence supporting his decision"); *see also Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) ("Given that substantial evidence does not support the ALJ's other explanations for rejecting claimant's testimony, the ALJ's credibility analysis now rests entirely on his determination that there is a lack of objective medical tests evidencing pain to the degree asserted by claimant. This basis alone is insufficient."). Thus, remand is also required for further analysis and explanation of the credit to be given to the lay witness testimony.

## CONCLUSION

The decision of the Commissioner is reversed and the case remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Court expresses no opinion as to whether, upon remand, the Commissioner should find that Plaintiff has any specific impairments or functional limitations or make any other specific findings or conclusions in evaluating whether Plaintiff is disabled within the meaning of the Social Security Act. Rather, on remand, the ALJ must consider all of the relevant evidence and make all findings and conclusions required by the Act. A separate judgment shall be entered.

ENTERED this 26th day of September, 2016.

_____
CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE